MARY J. BOYLE, J.:
{¶ 1} Defendant-appellant, Matthew Minarik, appeals his conviction for sexual imposition, a misdemeanor of the third degree, and his sentence. He raises three assignments of error for our review:
1. The defendant was denied the effective assistance of counsel, in derogation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
2. The trial court abused its discretion and/or otherwise issued an unlawful sentence when it imposed as a condition of probation that a physician's assistant, convicted of sexual imposition involving a patient, a third degree misdemeanor, is prohibited from working in any healthcare position where he has contact with patients and cannot examine or treat patients; the order exceeded the court's authority and the "residual" provision of R.C. 2929.27(C) is unconstitutionally vague in violation of due process.
3. The imposition of a fifteen-year period of sex-offender registration upon a defendant who commits a third degree misdemeanor constitutes an excessive punishment, in violation of the Eighth Amendment to the United States Constitution, and Article I, Section 9 of the Ohio Constitution.
{¶ 2} Finding no merit to his assignments of error, we affirm.
I. Procedural History and Factual Background
{¶ 3} On January 25, 2017, the Cuyahoga County Grand Jury indicted Minarik for one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), one count of gross sexual imposition in violation of R.C. 2907.05(A)(3), and one count of menacing by stalking in violation of R.C. 2903.211(A)(3). Minarik pleaded not guilty to the indictment, and the case proceeded to a jury trial where the following took place.
{¶ 4} The state first called the victim, who explained that on July 14, 2016, she woke up and could not move her neck and had "excruciating" back pain. As a result, she had her mother drop her off at the Parma General Hospital's emergency room. She stated that she was escorted back to an examination room where a nurse took her vitals, told her that Minarik, *556 a "good back doctor," would be in to see her, and left the room.
{¶ 5} She stated that when Minarik came in the room, he checked her vitals and asked her some background questions, including what her occupation was. The victim told Minarik that she was a server at Bahama Breeze and that she visited a chiropractor the day before. Minarik told her that she was likely suffering muscle spasms and gave her a Valium and sent her to get x-rays.
{¶ 6} The victim stated that after meeting with Minarik, she changed into a hospital gown and was escorted by two other men to get x-rays. She testified that after taking the Valium, she became "very giggly" and felt "very light."
{¶ 7} She testified that after completing the x-rays, Minarik "said he needed to check [her] out again, do [her] vitals before [she left,] check [her heart rate,] listen to [her] lungs." She stated at that point he began examining her chest with a stethoscope and asked her to unclasp her bra. The victim described her bra as one with a "front clasp * * * [with] a criss-cross back." She said that once she unclasped the bra, it fell open and left her totally exposed.
{¶ 8} The victim testified that as he was checking her heart rate, Minarik told her that she "could make a lot of money on those things, referring to [her] breasts." She explained that Minarik was checking her heart rate with the stethoscope in between his fingers, near the palm of his hand. She stated at one point, Minarik put the stethoscope at the bottom of her breast, "as if he was holding up [her] boob like a bra[.]" She stated that he did that "in separate intervals for maybe 30 seconds."
{¶ 9} The victim testified that after Minarik finished checking her heart, he gave her his phone number on one of his business cards and said that if she quit smoking cigarettes, he would take her out to dinner. She stated that his comment made her uncomfortable.
{¶ 10} According to the victim's mother, who dropped the victim off at the hospital, the victim texted her asking her to "please hurry, this doctor is a perve." The victim stated that when her mother picked her up, she told her what happened.
{¶ 11} Later that evening, Minarik left the victim a voicemail on her mother's phone. During the 20-second message, Minarik states, "This is Matt, [inaudible] the physician's assistant that took care of you the other day. Just checking to see how your back is doing. Please give me a call back. [Gives phone number.] I'll be here until 7 o'clock tonight. Take care. Hope you're doing well."
{¶ 12} During her testimony, the victim explained that she did not immediately tell anyone besides her mother about her visit to the emergency room because she was embarrassed and felt degraded. Eventually, however, the victim spoke with an acquaintance who worked as a nurse and who told her to go to the police. She also told her probation officer who also told her to go to the police.[1]
{¶ 13} The victim reported the incident to the Parma Police Department and spoke with Detective David Sheridan on July 29, 2016. Later that week, the victim identified Minarik as the perpetrator in a photo lineup.
{¶ 14} On August 2, 2016, the victim stated she was working at Bahama Breeze when she saw Minarik sitting at the bar *557 with a friend. She stated that Minarik waved her over. She stated that she did not go to talk to him and called her mother and Detective Sheridan. According to the victim, Detective Sheridan told her to play it off, "tell [Minarik] that she would call him later." She said she went over and had a conversation with Minarik as he was leaving and told him that she would call him later.
{¶ 15} When Detective Sheridan arrived at the restaurant, the victim called Minarik with the detective and another officer listening. She stated that the goal of the call was to "get him to admit to what he had done previously."
{¶ 16} The state played the recording, during which the following can be heard:
MINARIK: Matt Minarik.
VICTIM: Hi, it's [victim's name].
MINARIK: Hey. How are you?
VICTIM: I'm good. How are you doing?
MINARIK: I didn't recognize the number so I didn't pick up the first time.
VICTIM: Okay. When you originally called, you called my mom's phone. She gave me the message.
MINARIK: Oh is that right?
VICTIM: Mm-hmm.
MINARIK: Yeah. I had it as your number, but that's okay.
VICTIM: So what were you doing at my work today? You stalking me?
MINARIK: Yes, [inaudible]. [Laughs.] I went to meet my buddy. [Inaudible.] And he says, "Where do you want to meet?" I says, "I know a place where we can meet." [Laughs.] So I said, "I hope she doesn't think I'm stalking her, because I'm certainly not." [Laughs.] I thought, "I wonder if she thinks I am, because I'm really not." So it's kind of funny. How's work, okay -
VICTIM: Do you do this with all your patients?
MINARIK: No actually. I haven't been with any of them. [Laughs.]
VICTIM: Yeah, no. I'm just on break at work now. I just stepped outside and figured to call you.
MINARIK: Yeah, I appreciate that. Still look good.
VICTIM: Thank you.
MINARIK: You look better when I saw you, but you look good. [Laughs.]
VICTIM: Oh, gee. Thanks.
MINARIK: How's work [inaudible]? * * *
VICTIM: Yeah, it's pretty busy. I just had to step out for a minute. It gets pretty warm in there.
MINARIK: Do you make enough money there?
VICTIM: Oh yeah, of course. Why?
MINARIK: Oh good. That's good. It's good that you make enough money. Good. Your back's better?
VICTIM: Yeah, it's okay. It's hurting a little bit still.
MINARIK: Well, I could probably help.
VICTIM: How?
MINARIK: Massage and drugs. [Laughs.]
VICTIM: Massage and drugs. Oh geez. Really?
MINARIK: [Inaudible.]
VICTIM: How about a massage then?
MINARIK: That sounds good.
VICTIM: I mean you were good at doing that on my boobs at the hospital.
MINARIK: I didn't touch it.
VICTIM: Malarkey.
*558 MINARIK: I wanted to, but I didn't.
VICTIM: Malarkey.
MINARIK: But I'd probably have to do that type too, to get the balance. Do the front and back, you know? [Laughs.]
VICTIM: From what I remember, you were touching them. And I liked it a little bit.
MINARIK: Well, we can do that again. We can make sure you like it again.
VICTIM: [Laughs.]
MINARIK: [Laughs.] You live with mom?
VICTIM: Nope.
MINARIK: Oh. You live alone?
VICTIM: Mm-hmm.
MINARIK: Well I can come by and do it.
VICTIM: Well I'll have to call you later because I got to run back in. We're getting kind of busy now.
MINARIK: Alright. Good. This your number?
VICTIM: Uh-huh. Nice to see you.
MINARIK: Alright. It was really good to see you. Alright. I'll talk to you later.
VICTIM: Alright. Bye.
MINARIK: Okay. Bye-bye.
{¶ 17} The next morning after the phone call, Minarik left the victim a second voicemail, this time on the victim's cell phone. During the voicemail, Minarik states, "Hey, [victim's name]. It's Matt. Um, Dr. Matt. Um. Give me a call when you know what your schedule is. Okay?"
{¶ 18} Michael Harmon, an investigator from the medical board who investigated the victim's complaint and interviewed Minarik, testified next. Describing the interview, Harmon testified that Minarik "started off explaining - basically lying to me, telling me nothing improper had occurred. And as we spoke and I reminded [Minarik] of his obligation to be truthful with the medical board, then he was a little more forthcoming." Harmon explained that during the interview, Minarik's story changed, and Minarik said he made a mistake. According to Harmon, Minarik told him that after the victim came back from her x-rays, he "recognized that she was under the influence of the Valium * * * [and that] he went back in and * * * check[ed] her heart. He admitted that * * * the bra had become unclasped."
{¶ 19} Harmon testified that Minarik told him that "the second examination * * * was absolutely medically unnecessary. And * * * the only reason he went back in there [was] * * * to look at all of her." Harmon also testified that Minarik "admitted that he had crossed some professional boundaries [and] * * * that he had went to her place of employment[.] * * * He said he went there with a friend, and that he had hoped that she would be there."
{¶ 20} Harmon stated that his interview with Minarik was audio recorded, which was played in court. In the recording, Harmon explained the allegations to Minarik. Minarik admitted that he went to Bahama Breeze and that he ran into the victim by coincidence. Minarik explained his recollection of the victim's visit to the emergency room. At first, Minarik stated that he only checked the victim's heart once and would only have checked her heart twice if she had a heart condition. He stated that he never saw the victim's breasts and that he may have had the victim unclasp her bra so that he could "get underneath" if it was in the way. Minarik stated that he never made a comment about her breasts, but that he said he bets she made a lot of money serving. He also stated that when the victim called him, he was very uncomfortable.
*559 {¶ 21} During the recording, Harmon makes a number of comments suggesting that he did not believe Minarik, such as "[a]re you sure[,]" "This is that part where I'm telling you, you need to be absolutely honest. This would be one of those times[,]" and "[i]t does not sound legitimate to me." Additionally, Harmon explained that he never heard of a doctor asking a patient to unclasp her bra for a heart examination before. Harmon stated that he did not understand how Minarik could remember a specific conversation he had with the victim but not other details, such as whether he checked the victim's heart once or twice. Harmon also told Minarik that his report would be confidential and that his wife or his employer would not see the report.
{¶ 22} Later during the interview, Minarik admitted that he "made a mistake" and "got carried away." He stated that he "would never have met" the victim and that he made a mistake by calling her back and by possibly giving her an impression that he would meet her at her home. Minarik stated that he was "not going to have an affair with [the victim]."
{¶ 23} Minarik also told Harmon that he was attracted to the victim and that he asked her to unclasp her bra because of his attraction but that he did not touch the victim's breasts. He said that he wanted to see her breasts, but that he did not see them. He then stated that he saw part of them, and that he was hoping to see them. Minarik stated that the victim's breasts were "nice" and that he "wish [he] would have touched them," but that he did not do so. He said he wanted to touch the victim's breasts. Minarik told Harmon that he made a mistake by coming back into the room a second time, which he did so that he could "look at all of her."
{¶ 24} After some more discussion with Harmon, Minarik stated that having a victim unclasp her bra for a heart examination is not standard procedure and that he did not initially admit it because he was embarrassed. He also admitted that there was not a professional reason to go back into the room a second time. When asked if he could have checked the victim's heart without having her unclasp her bra, Minarik responded, "Absolutely."
{¶ 25} The following exchange also occurred:
HARMON: I think maybe you had an interest in her. Maybe at some point you realized, "Hey, I'm taking this too far. I need to knock it off." But I think there's initially a physical attraction there. I think there's an interest.
MINARIK: You are right.
HARMON: And I think you probably crossed some professional boundaries.
MINARIK: I think I did too.
HARMON: I'm not sure you committed a crime.
MINARIK: I know. But I did commit a crime, Mike. I did.
{¶ 26} Another exchange concerning Minarik's placement of the stethoscope also occurred:
HARMON: Was it on the breast?
MINARIK: Part of it was.
HARMON: Which one? Both of them?
MINARIK: Just the left.
HARMON: Are you sure?
MINARIK: Yeah because there's no reason to listen to the right. * * *
HARMON: You had no reason to do several things here. You can't say, I didn't have a reason to do it, so I didn't do it.
MINARIK: But I probably, in my mind, said I could probably justify this.
*560 {¶ 27} After the above exchange, Minarik stated that he did not remember if he touched the victim's left breast with his hand. Minarik stated that it might be true, but that he did not remember it. He repeated that checking around the victim's breasts was not medically necessary, but then maintained that he did not touch the victim's breasts. Minarik admitted that he offered to reclasp the victim's bra for her, and that the victim said, "[g]o ahead." Minarik stated that he could not reclasp the bra. He stated that he offered to reclasp the victim's bra to be "funny, cute, and stupid" but agreed that it was unprofessional.
{¶ 28} After some more questions, Minarik admitted that he told the victim that she could make more money off her breasts somewhere other than Bahama Breeze.
{¶ 29} Minarik also stated that he did not ask the victim out on a date. He said that when he went to Bahama Breeze with his friend, he was hoping to see her.
{¶ 30} Throughout the interview, which lasted for over an hour, however, Minarik maintained that he did not touch the victim's breasts or make sexual advances toward the victim.
{¶ 31} At the very end of the interview, Minarik admitted that he saw the victim's breasts when he offered to tie her gown during his first in-room visit with her before she went back to get x-rays. He still maintained that he did not touch her breasts. Harmon stated that he did not believe that Minarik was being truthful when he stated that he did not touch the victim's breasts and that it did not seem "feasible."
{¶ 32} Harmon testified that after his interview with Minarik, he spoke with Detective Sheridan and told the detective that "it would be in his best interest to re-interview the suspect." Harmon stated that he also interviewed the victim as well as Dr. Rose, the emergency department director of Parma General Hospital.
{¶ 33} The following exchanges occurred during Minarik's counsel's cross-examination of Harmon:
COUNSEL: I've got to tell you, you are a fantastic interrogator. Great job.
HARMON: Thank you.
* * *
COUNSEL: At what point did you decide that he committed a felony that you needed to report it?
HARMON: * * * [I]f I suspect that a felony may have occurred - and I think anyone who listens to that interview would have the same suspicion - I notify my supervisor.
* * *
COUNSEL: Would it surprise you that it was nearly 50 times that he denied touching the breast throughout the 75 minutes [of the interview]?
HARMON: Clearly he's in denial, that's why we're here.
* * *
COUNSEL: In fact, you thought his whole story was totally unbelievable.
HARMON: I don't believe I ever said that.
COUNSEL: Okay. Now you said to him that your opinions would never be in your report, correct?
HARMON: Yes.
Minarik's counsel then introduced Exhibit A, which was Harmon's investigation report. The following exchange then occurred related to that report:
COUNSEL: [W]hen you refer down to the bottom that his denial is unbelievable, isn't that your opinion?
* * *
*561 HARMON: I guess you could call it an opinion. * * * I believe it to be true that he lied about that.
* * *
COUNSEL: In fact, in your report you said it's unbelievable, implausible, impossible [to attempt to fasten a front-fastening bra without touching the person's breasts]. Aren't those opinions?
HARMON: I guess you could call them opinions.
COUNSEL: But you said you were never going to enter it, it's just the facts.
HARMON: * * * [W]hat I would maybe call conclusions, you would call opinions. * * * After talking to him, I think it was clear that he was withholding facts, and I think he lied to me. That's my conclusion. As an investigator that's what's required of me.
* * *
COUNSEL: This would be maybe 48:39 minutes into your interrogation where you said, so you're saying there was no squeezing, touching, fondling, of both the breasts all over. And do you remember what his response was? * * * Pretty much a gasp[.]
HARMON: I don't believe him, so his being aghast, I think you said, didn't sway me.
COUNSEL: Is it because you don't believe him that you got a great confession out of him, but he just didn't say what you wanted.
HARMON: He didn't say the truth. It's not what I want. He didn't tell the truth.
COUNSEL: And you're a judge of the truth.
HARMON: I believe I'm a pretty good read of people after all these years.
{¶ 34} On redirect, the state asked Harmon what he meant during the interrogation when he said "at least you're being honest." Harmon stated, "I think at that point he had actually said something that was honest. And it was a break from what he had previously did up to that point." The state also asked Harmon why some of the individuals he investigated only admitted to certain things, but not everything they did. Harmon explained that "They don't want - this is embarrassing. I think this whole situation is embarrassing for him, in his personal life, in his professional life, certainly, and he doesn't want to admit to it."
{¶ 35} The state then called Dr. Rose, who testified that he oversaw physician assistants. He stated that physician assistants "are independent licensed practitioners, but they work with the physician under the physician['s] direction." He also said that physician assistants are not allowed to refer to themselves as "doctor." Dr. Rose explained how a heart exam is typically conducted, saying "[t]here [are] four points of the chest that you should listen to, to do a proper heart exam." He said that those four points include the aortic valve on the right side of the chest, the pulmonary valve on the left side of the chest, the tricuspid valve in the costal space, and the mitral valve near the midaxillary line. He explained that to check the mitral valve, you need to check under the breast. He demonstrated the areas where those valves are located on the prosecutor. Dr. Rose also testified that people do not have to unclasp their bras to perform a heart exam and that the only medical reason to have someone unclasp her bra would be to look at the skin, such as for a rash. On cross-examination, Dr. Rose stated that it is "not a problem" if a physician's assistant contacts a patient to follow up.
*562 {¶ 36} The state then called the victim's probation officer, who testified that the victim came to her in July 2016 to report that she was prescribed Valium for her back and "mentioned that * * * a particular doctor had made her uncomfortable during a doctor's visit." The state also called the patrolman for the city of Parma, who first spoke to the victim and to whom the victim gave Minarik's business card with his personal cell phone number written on it.
{¶ 37} The state's final witness was Detective Sheridan, who testified that during his interview of the victim on July 29, 2016, they tried to make a few "controlled calls" to Minarik, but were unsuccessful.[2] Detective Sheridan stated that the victim came in the following week to review a photo lineup, during which she identified Minarik. The detective stated the next time he heard from the victim was when she called him to say that Minarik was at her workplace. He stated that he went to Bahama Breeze with another detective and had the victim make a recorded call to Minarik.
{¶ 38} The detective stated that he left after the phone call and later contacted Minarik himself to conduct an interview. The interview was video and audio recorded.
{¶ 39} During the interview, Minarik described the victim's visit to the emergency room, stating that he checked her back, sent her to get x-rays, and checked her heart and lungs both before and after the x-rays. He recounted specific conversations he had with the victim during that visit. He explained that he went to Bahama Breeze with his friend the day before and saw the victim. He also described the conversation that he had with the victim over the phone after he saw her at Bahama Breeze. He stated that the victim was flirting with him.
{¶ 40} When asked about the second heart examination, Minarik stated that he asked the victim to undo her bra clasp but that her breasts remained covered. Minarik stated that he did not believe that the stethoscope touched her breast. He said that the stethoscope might have touched part of her breast, but that he did not fondle it. When asked if he made a comment about the victim being able to "make a lot of money with those[,]" Minarik stated that he did not say that, but only that he was sure she made a lot of tips.
{¶ 41} After his interview with Minarik, the detective testified that he spoke with a number of other individuals, including the victim's mother and probation officer as well as Minarik's supervisor, Dr. Rose, and Jeffrey Gessler, Minarik's friend with whom he had drinks at Bahama Breeze. Detective Sheridan also stated that he contacted the medical board to notify them of the victim's complaint against Minarik.
{¶ 42} The detective stated that he spoke with Harmon from the medical board on a number of occasions and that Harmon told him that Minarik admitted that the second examination of the victim was "not medically needed, and [that] he did it for personal reasons." Detective Sheridan stated that he subpoenaed the medical board for a copy of Harmon's interview with Minarik. The detective then interviewed Minarik again and read him his Miranda warnings. The detective's second interview with Minarik was also video and audio recorded.
*563 {¶ 43} During the second interview, Minarik again said that he never saw the victim's breasts. He then admitted that he touched the victim's bra when he tried to reclasp the bra after the second heart examination. Detective Sheridan then told Minarik that the call between him and the victim was recorded. Minarik again stated that he did not touch or see the victim's breasts. Minarik admitted that the unclasping of the bra was unnecessary and that he "wish [he] had not done the second exam." Minarik also described what he said during his interview with Harmon. Minarik then stated that when the victim called him, he was at home drinking and under the influence. He stated that the victim was leading him on and that he was confused. When asked why he checked the victim's vitals after a nurse already had checked them, Minarik stated "because she was a smoker." Minarik apologized to the detective that he left out the detail about how he attempted to reclasp the victim's bra.
{¶ 44} The state then rested its case, and Minarik moved for an acquittal under Crim.R. 29. The trial court denied the motion.
{¶ 45} Minarik first called Gessler to the stand who testified that he went to Bahama Breeze with Minarik on August 2, 2016. He stated that the victim approached Minarik at the bar and that Minarik asked her how her back felt. He testified that he and Minarik left less than five minutes after Minarik's conversation with the victim.
{¶ 46} Bret Kitchen, a registered nurse who worked with Minarik in Parma General Hospital's emergency room, testified next. He stated that when the emergency room is "overwhelmed," it is not always possible to have a second person in the room when performing a heart exam or body assessment. He also testified that the physician assistants in the emergency room typically attend to patients complaining of aches and pains. He explained that nurses often take a patient's vitals first and will often tell the patient that the "doctor will be in to see you shortly" even though the next professional to see that patient is a physician's assistant. He then demonstrated how to perform a heart exam and explained that "sometimes if people's breasts are large you have to move them out of the way." He also explained that "at times, you need to listen to the apex of the heart, which is located * * * down underneath the breast." Kitchen testified that the tricuspid valve is "located almost at center between the breasts" and that that valve cannot be checked if covered by a bra's metal clasp. He stated that heart exams are "always easier if stuff is not in the way."
{¶ 47} Finally, Firouz Daneshgari, a surgeon and medical professional for Case Western Reserve University School of Medicine, testified. Daneshgari stated that he hired Minarik to work for his medical company after Minarik left Parma General Hospital and that he knew about the allegations against Minarik. Daneshgari stated that as a physician assistant for his company, Minarik sees patients at the company's clinics, most of whom are women. He explained that when performing a heart exam and checking the four valves, he would have a patient take her bra off.
{¶ 48} Minarik rested and renewed his Crim.R. 29 motion that the trial court, again, denied. Minarik then moved to admit Exhibit A, Harmon's report of investigation, and the state did not object. The report recites the victim's allegations as well as Minarik's statements made during the controlled call with the victim as well as the voicemails he left. The report also includes Minarik's statements, including his admissions that he conducted the second *564 examination of the victim because "he wanted to check her out again[,]" he was "attracted to the victim," that he had no medical reason to examine her again, and that she "was flirtatious and made him feel young again." Harmon's report also included the following statements suggesting he did not believe Minarik and that he believed Minarik's actions were illegal:
PA Minarik attempted to justify the telephone calls to the victim as a quality control measure established by his supervisor.
PA Minarik's actions appear to be extremely unprofessional and illegal.
PA Minarik eventually acknowledged that his conduct in this matter was unprofessional, but he had a hard time acknowledging the severity of his actions, stating that the victim never told him to stop and that she was flirtatious.
Although PA Minarik denies ever touching the victim's breasts, his denial is unbelievable. PA Minarik has admitted to every accusation made by the victim up to the point of touching her breasts, which is implausible.
It would be virtually impossible to attempt to fasten the front fastening bra without touching the victim's breasts.
PA Minarik was initially evasive and untruthful and denied the allegations.
PA Minarik continued to be evasive and was reminded of his obligation to provide truthful answers.
Based on the initial allegations made by [the victim] to the Parma Police Department, * * * the improbability that PA Minarik did not see [the victim's] breasts, * * * and the improbability that PA Minarik did not touch [the victim's] breast, this issue is substantiated.
[I]t is this investigator's conclusion that PA Minarik poses an immediate threat to public safety.
{¶ 49} The trial court then read its instructions to the jury, and the parties presented closing arguments.
{¶ 50} The jury found Minarik guilty of sexual imposition, a misdemeanor of the third degree, in violation of R.C. 2907.06(A)(1), a lesser-included offense of gross sexual imposition under R.C. 2907.05(A)(1), charged in Count 1 of the indictment. It found him not guilty of menacing by stalking charged in Count 3 of the indictment and could not reach a verdict as to gross sexual imposition under R.C. 2907.05(A)(3) charged in Count 2 of the indictment. As a result, the trial court declared a mistrial as to Count 2, and the state dismissed that count without prejudice.
{¶ 51} At sentencing, the trial court determined Minarik to be a Tier I sex offender - the lowest of the tiers - pursuant to R.C. 2950.01(E)(1)(a), and explained to him the registration and reporting requirements, which included that he annually verify his information for a period of 15 years. The trial court sentenced Minarik to a 60-day jail term, 45 days of which was suspended, and two years of community control. As part of his supervision, the trial court ordered that Minarik "is not permitted to work in any healthcare position where he has contact with patients" and that he "is not permitted to examine or treat patients." In its journal entry, the trial court stated that "no modifications of any of the defendant's conditions may be made without prior approval of the court."
{¶ 52} Minarik subsequently moved the court to suspend the execution of his sentence pending his appeal. The trial court denied his motion. After filing his appeal with our court, Minarik moved for a stay of execution of his 15-day sentence and community control sanctions, which we granted.
*565 {¶ 53} Minarik now appeals his sexual imposition conviction and sentence.
II. Law and Analysis
A. Ineffective Assistance of Counsel
{¶ 54} In his first assignment of error, Minarik argues that he was denied the effective assistance of counsel because his trial counsel (1) failed to object when the investigator from the medical licensing board testified that he did not believe Minarik's account, (2) repeatedly elicited testimony from the investigator that Minarik was not credible during cross-examination, and (3) sought to admit a medical investigator's report that contained harmful credibility determinations and legal conclusions.
{¶ 55} While "[t]he right to counsel is the right to the effective assistance of counsel," the defendant carries the burden of establishing a claim of ineffective assistance of counsel on appeal. Strickland v. Washington , 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), citing McMann v. Richardson , 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) ; State v. Corrothers , 8th Dist. Cuyahoga No. 72064, 1998 WL 57094, 7 (Feb. 12, 1998), citing State v. Smith , 3 Ohio App.3d 115, 444 N.E.2d 85 (8th Dist.1981). "Judicial scrutiny of defense counsel's performance must be highly deferential." State v. Sanchez , 8th Dist. Cuyahoga No. 103078, 2016-Ohio-3167, 2016 WL 3019644, ¶ 8, citing Strickland . Further, " 'trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel.' " Id. at ¶ 26, citing Strickland, and quoting State v. Foster, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, 2010 WL 2682207.
{¶ 56} To gain reversal on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Strickland at 687, 104 S.Ct. 2052. The first prong of Strickland 's test requires the defendant to show "that counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. 2052. Strickland 's second prong requires the defendant to show "a reasonable probability that but for counsel's errors, the proceeding's result would have been different." State v. Winters , 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, 2016 WL 936116, ¶ 25, citing Strickland .
{¶ 57} When deciding claims of ineffective assistance of counsel, courts may analyze the two prongs out of order. Strickland at 697, 104 S.Ct. 2052 ; State v. Bradley , 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed." Strickland at 697, 104 S.Ct. 2052 ; see also State v. Ferrell , 8th Dist. Cuyahoga No. 100659, 2015-Ohio-1446, 2015 WL 1737616, ¶ 12, citing Bradley ("If [an ineffective assistance of counsel] claim can be disposed of by showing a lack of sufficient prejudice, there is no need to consider the first prong, i.e., whether trial counsel's performance was deficient.").
1. Failure to Object to Harmon's Opinion of Minarik's Credibility
{¶ 58} Minarik first argues that his trial counsel was ineffective by failing to object when Harmon, the investigator from the medical licensing board, testified that he did not believe Minarik's account.
{¶ 59} " 'A defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible.' As the Supreme Court of Ohio stated, 'Counsel is certainly not deficient for failing to raise a meritless issue.' " State v. Carter , 2018-Ohio-2238, --- N.E.3d ----, ¶ 47, *566 quoting State v. Taylor , 78 Ohio St.3d 15, 31, 676 N.E.2d 82 (1997).
{¶ 60} " 'In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.' " State v. Boston , 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), quoting State v. Eastham , 39 Ohio St.3d 307, 530 N.E.2d 409 (1988). While Boston involved a pediatrician's testimony concerning the truthfulness of a child-victim's allegations, the same rule "also applies to lay witnesses testifying to the truthfulness of another witness, which includes a police officer's testimony that an accused was untruthful." State v. Allen , 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, 2010 WL 27548, ¶ 49.
{¶ 61} Harmon stated that he did not find Minarik credible a number of times during his direct testimony. After review, we find those statements were improper.
{¶ 62} Nevertheless, while objections to Harmon's statements could certainly have been meritorious, we find that Minarik's trial counsel's decision to not object constituted trial strategy. See State v. Hartman , 93 Ohio St.3d 274, 296, 754 N.E.2d 1150 (2001), quoting State v. Campbell , 69 Ohio St.3d 38, 630 N.E.2d 339 (1994) ("The failure to object to error, alone, is not enough to sustain a claim of ineffectiveness. 'Because objections tend to disrupt the flow of a trial, and are considered technical and bothersome by the fact-finder, * * * competent counsel may reasonably hesitate to object in the jury's presence.' "). It is clear from the transcript that Minarik's trial counsel's strategy was to discredit Harmon, attempting to show that Harmon was biased against Minarik from the beginning, which would explain why Harmon would not believe him. This strategy and failure to object to Harmon's testimony was reasonable in light of the fact that Minarik's trial counsel knew that the state was going to play Harmon's audio-recorded interview with Minarik, during which Minarik changed his story on multiple occasions and eventually admitted to everything except actually touching the victim's breasts.
{¶ 63} Moreover, even if we were to find that the decision not to object was not reasonable trial strategy, we cannot say that Minarik's trial counsel's error was prejudicial.
[I]n determining whether an error was prejudicial or harmless, a reviewing court must first read the entire record, disregarding the objectionable material. If there is overwhelming evidence of the appellant's guilt, aside from the dispute material, then it must hold that the error is not prejudicial but is harmless beyond a reasonable doubt and affirm the trial court's judgment.
State v. Potter , 8th Dist. Cuyahoga No. 81037, 2003-Ohio-1338, 2003 WL 1355230, ¶ 38, citing Crim.R. 52 and Chapman v. California , 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
{¶ 64} After a review of the entire record, without considering Harmon's testimony on direct examination concerning Minarik's credibility, we find that the error was harmless. There was a great deal of evidence in the record from which the jury could conclude that Minarik was not credible and that he was guilty of sexual imposition. During Harmon's recorded interview with Minarik, Minarik changes his story on multiple occasions, initially denying that he performed a second heart examination and stating that asking a patient to unclasp her bra was a typical medical request. Later in the interview, however, Minarik admits to performing a second heart examination, states that unclasping one's bra is not necessary for a heart examination, and even admits that he only *567 went back to examine the victim a second time because he wanted to see her breasts and look "at all of her." Minarik made similar denials and eventual admissions in his interviews with Detective Sheridan as well. All of those interviews, in conjunction with the recorded phone call between Minarik and the victim, provided overwhelming evidence that could allow the jury to conclude that Minarik lacked credibility and provided overwhelming support for the victim's version of events that Minarik touched her breast.
2. Cross-Examination of the Medical Licensing Board Investigator
{¶ 65} Minarik also argues that his trial counsel was ineffective because he "elicited damaging opinion testimony regarding his client's credibility on cross-examination."
{¶ 66} As we stated earlier, after review of the cross examination, it appears that Minarik's trial counsel was attempting to establish that Harmon was biased against Minarik and discredit his entire investigation. Considering the taped interviews during which Minarik changes his story on multiple occasions, eventually admits that he wanted to see the victim's breasts, and states that the second examination was medically unnecessary, we cannot say that trial counsel's strategy fell below an objective standard of reasonable representation. Harmon's testimony and his audio-recorded interview with Minarik were so damaging that Minarik's trial counsel was left to attack Harmon as biased.
3. Admission of the Medical Investigator's Report
{¶ 67} Finally, Minarik argues that his trial counsel was ineffective because it "sought admission of the medical investigator's report, which contained not only opinions as to [Minarik's] credibility, but as to the legality of his actions."
{¶ 68} As discussed earlier, while it is clear that Minarik's trial counsel sought to establish that Harmon was biased against Minarik in an effort to counter Minarik's admissions during his interview with Harmon, trial counsel's admission of Harmon's investigator's report is puzzling. In addition to summaries of Harmon's interviews with the victim and Minarik, the report contained statements showing that Harmon did not believe Minarik and that he believed Minarik's actions were illegal.
{¶ 69} Assuming for the sake of argument that submitting such evidence to the jury was not sound trial strategy, we nonetheless find that the admission of the report did not prejudice Minarik. The report was a regurgitation of Harmon's interview with Minarik, which the jury heard. The recorded interviews with Detective Sheridan, as well as the victim's testimony, also provided a great deal of evidence against Minarik. Therefore, we cannot say that Minarik was prejudiced by the admission.
{¶ 70} As an additional note, Minarik's trial counsel's efforts were certainly effective in that Minarik avoided convictions for two felonies and a misdemeanor of the first degree, for which he faced a potential sentence of 6 to 18 months of prison and a $5,000 fine for each felony and up to 6 months in jail and a maximum fine of $1,000 for the misdemeanor. He was not convicted on the felony charge for gross sexual imposition, but instead for the lesser-included third-degree misdemeanor for sexual imposition and received a 15-day jail term and two years of community control.
{¶ 71} Therefore, based on all of the above, we overrule Minarik's first assignment of error.
*568 B. No Contact with Patients
{¶ 72} In his second assignment of error, Minarik argues that the trial court abused its discretion when it imposed as a condition of Minarik's community control that he could not work in any healthcare position in which he would have contact with patients and that he could not treat or examine patients. He also argues that R.C. 2929.27(C), the statute allowing a trial court to impose "any other sanction," is unconstitutionally vague.
{¶ 73} R.C. 2929.27(A) states, "[T]he court imposing a sentence for a misdemeanor, other than a minor misdemeanor, may impose upon the offender any nonresidential sanction or combination of nonresidential sanctions authorized under this division."
In addition to the [nonresidential] sanctions authorized under division (A) of this section, the court imposing a sentence for a misdemeanor * * * upon an offender who is not required to serve a mandatory jail term may impose any other sanction that is intended to discourage the offender or other persons from committing a similar offense if the sanction is reasonably related to the overriding purposes and principles of misdemeanor sentencing.
R.C. 2929.27(C).
{¶ 74} "The overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.21(A). "To achieve those purposes, the sentencing court shall consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." Id.
{¶ 75} A court may impose additional community control conditions as long as those conditions are "not * * * overbroad and [are] reasonably relate[d] to the goals of community control: 'rehabilitation, administering justice, and ensuring good behavior.' " State v. Mahon , 8th Dist. Cuyahoga No. 106043, 2018-Ohio-295, 2018 WL 565512, ¶ 7, quoting State v. Talty , 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201. To determine whether a condition of community control serves those purposes, "courts should consider whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." State v. Jones , 49 Ohio St.3d 51, 53, 550 N.E.2d 469 (1990).
{¶ 76} We review a trial court's imposition of community control sanctions for an abuse of discretion. Talty at ¶ 10, citing Lakewood v. Hartman , 86 Ohio St.3d 275, 714 N.E.2d 902 (1999). "All three prongs of the Jones test must be satisfied for the reviewing court to find that the trial court did not abuse its discretion." Mahon at ¶ 8, citing State v. White , 10th Dist. Franklin No. 14AP-1027, 2015-Ohio-3844, 2015 WL 5555222. In conjunction with this standard of review, however, we remain mindful that "a trial court's discretion in imposing [community control] conditions is not limitless." Talty at ¶ 11, citing Jones .
{¶ 77} We find that the community control condition prohibiting Minarik from working in a healthcare position where he will have contact with patients satisfies all three factors. The condition satisfies the first Jones factor because it is reasonably related to rehabilitating Minarik. Specifically, "it is aimed at keeping him out of situations where he may be tempted to *569 reoffend." State v. Recker , 3d Dist. Putnam Nos. 12-14-03 and 12-14-04, 2014-Ohio-4993, 2014 WL 5803008, ¶ 18 ; see also State v. Hultz , 5th Dist. Ashland No. 06-COA-003, 2006-Ohio-4056, 2006 WL 2257025, ¶ 14 ("The removal of appellant from places of temptation is related to promoting rehabilitation and good behavior and deterring future criminality."). The condition effectively protects patients and Minarik from the set of circumstances that gave rise to the victim's harm and Minarik's conviction. The condition clearly satisfies the second Jones factor - bearing some relationship to the underlying crime - because it prohibits Minarik from examining patients. Finally, the condition satisfies the third Jones factor - reasonably related to future criminality and the statutory purposes of community control - because prohibiting Minarik from examining or treating patients is reasonably related to rehabilitating him and protecting patients from Minarik's criminal conduct. See Recker at ¶ 19 (finding that the 250-foot, no-contact condition was reasonably related to rehabilitating the appellant and protecting the victims).
{¶ 78} Minarik argues that the trial court's imposition of the condition usurped the Ohio State Medical Board's authority. Citing R.C. 4730.25, he claims that the board has "exclusive statutory authority to 'limit, revoke, or suspend an individual's license to practice as a physician's assistant.' "
{¶ 79} First, the trial court did not suspend Minarik's physician's assistant license, and the condition does not effectively deprive Minarik from supporting his family or from practicing as a physician's assistant as he argues. Minarik can still utilize his license in other ways, such as reviewing medical records.
{¶ 80} Minarik's argument is very similar to the defendant's argument in Strongsville v. Starek , 8th Dist. Cuyahoga No. 92603, 2009-Ohio-4568, 2009 WL 2841448. In that case, the appellant, a chiropractor who installed a two-way mirror in his x-ray room, argued that the trial court did not have authority to order that he not work under his chiropractic license as part of his probation. Addressing the appellant's argument, we held that "sentences which include occupational restrictions may survive the Jones test." Id. at ¶ 27. We went on to state that while "[a] better practice for courts to employ [would be] to prohibit an offender from working under his or her license pending review by the administrative board associated with that professional license[,]" we could not say that the trial court abused its discretion. Id. at ¶ 28.
{¶ 81} The same can be said of the condition imposed by the trial court in this case. Here, the trial court prohibited Minarik from examining or treating patients, but did not go as far as the trial court did in Starek, which completely prohibited him from using his medical license. While we agree with our previous opinion that the better practice would have been to prohibit Minarik from using his license until the medical board rendered a decision we, once again, cannot say, in light of the facts of this case, that the trial court abused its discretion in limiting Minarik's use of his license.
{¶ 82} Additionally, addressing Minarik's citation to Talty and argument that the court did not impose the "least restrictive alternative," we find that case to be distinguishable. In Talty , the court found that the antiprocreation condition of the defendant's community control was overbroad and that the trial court should have included a method by which that condition could be lifted. Id. at 181-182, 2004-Ohio-4888, 814 N.E.2d 1201. Talty concerned a basic liberty interest, procreation, whereas *570 this case involves Minarik's right to use his physician's assistant license to treat and examine patients. Minarik's argument that the court should have limited the condition to prohibiting Minarik from seeing female patients or having someone else in the room when examining female patients would put conditions on Minarik's employer. Evidence in the record - specifically, testimony from Kitchen - established that such specific conditions would be difficult to execute and uphold in an emergency-room atmosphere. Further, Minarik fails to recognize that the trial court could have prevented Minarik from using his license entirely, but instead, limited the condition in such a way that Minarik could still work in the healthcare field and perform such tasks as medical record review. Just because the condition is more restrictive than Minarik would like does not mean the trial court abused its discretion.
{¶ 83} We now turn to Minarik's argument that R.C. 2929.27 is unconstitutionally vague based on his comparison to Johnson v. United States , --- U.S. ----, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), where the United States Supreme Court declared that the Armed Career Criminal Act's "violent-felony" clause was void for vagueness.[3] Minarik argues that the statute is vague because it does not "provide fair notice that if a medical person commits a third degree misdemeanor, sexual imposition, he can be prevented as a condition of probation from seeing all patients."
{¶ 84} "Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes waiver of such issue and * * * therefore need not be heard for the first time on appeal." State v. Awan , 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus; see also Recker , 3d Dist. Putnam Nos. 12-14-03 and 12-14-04, 2014-Ohio-4993, at ¶ 29 ; State v. Dudukovich , 9th Dist. Lorain No. 05CA008729, 2006-Ohio-1309, 2006 WL 709102, ¶ 24. Here, Minarik failed to raise an issue concerning the constitutionality of R.C. 2929.14(C) below and, thus, he waived this argument.
{¶ 85} Further, even if Minarik had not waived the issue, we find that the statute is not unconstitutionally vague. Foremost, we presume that a statute is constitutional. State v. Anderson, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991). As a result, the party asserting that a statute is unconstitutionally vague has the burden to prove that assertion beyond a reasonable doubt. Id. , citing Jackman v. Court of Common Pleas , 9 Ohio St.2d 159, 224 N.E.2d 906 (1967).
{¶ 86} "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.' " Johnson , 135 S.Ct. 2551, 192 L.Ed.2d 569, at 2557, quoting Connally v. General Constr. Co. , 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). "These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." Id.
{¶ 87} "[V]ague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal *571 statute." United States v. Batchelder , 442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).
{¶ 88} We can find no Ohio case law addressing the constitutionality of R.C. 2929.27(C). There is, however, case law addressing similar vagueness arguments as to other sentencing statutes found in the Revised Code. For example, in State v. Moore , 9th Dist. Summit No. 19544, 2000 WL 422412 (Apr. 19, 2000), the court stated the following when addressing the appellant's argument that R.C. 2929.14(C) was unconstitutionally vague:
R.C. 2929.14(C) permits the judge discretion in reviewing the particular facts of a case in order to impose an appropriate sentence for the crime committed. This discretion is imperative in determining the fairness of a sentence. While R.C. 2929.14(C) is broadly phrased to permit this discretion, it is not unconstitutionally void for vagueness as it does not fail to give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden, or encourage arbitrary and discriminatory enforcement of the laws. Defendant's eleventh assignment of error is without merit.
Id. at 9.
{¶ 89} Similarly, in State v. Mushrush , 135 Ohio App.3d 99, 733 N.E.2d 252 (1st Dist.1999), the court found that R.C. 2929.14(C)'s phrase "the worst forms of the offense" was not unconstitutionally vague.[4] The court stated,
[S]entencing guidelines, in contrast to sentencing provisions, are not designed to inform the offender of the consequences of violating a criminal statute, but are intended to guide judges in imposing a sentence. See United States v. Wivell (C.A.8, 1990), 893 F.2d 156 ; State v. Jacobson (1998), 92 Wash.App. 958, 965 P.2d 1140. The guidelines merely limit the discretion of the sentencing judge. Every defendant is different and needs to be dealt with in a particular way. Taking away judicial discretion entirely turns judges into clerks. So long as the exercise of that discretion falls within the law, this court should not reverse a sentence, even if the sentence appears, as in the words of the sentencing judge in this case, "Draconian" and "harsh."
Id. at 110-111, 733 N.E.2d 252.
{¶ 90} Applying the above analyses to the instant case, we find that R.C. 2929.27(C) is not unconstitutionally vague. First, R.C. 2929.27 sets out "guidelines for trial courts when imposing a misdemeanor sentence." State v. Tribble , 7th Dist. Mahoning No. 16 MA 0009, 2017-Ohio-4425, 2017 WL 2665145, ¶ 24. "[T]he sentencing court is expressly provided with the discretion to determine the most effective ways to achieve the purposes and principles of misdemeanor sentencing by imposing any sanction provided in R.C. 2929.14 through 2929.28, unless a sanction is specifically required or specifically precluded from being imposed by the section setting forth the offense. R.C. 2929.21(A)." (Emphasis sic.) State v. Briskey , 7th Dist. Mahoning No. 12 MA 63, 2012-Ohio-5340, 2012 WL 5842656, ¶ 15. A trial court's community control sanctions imposed pursuant to R.C. 2929.27(C) are guided by the *572 purposes of misdemeanor sentencing as well as the goals of community control, discussed above. Like the courts recognized in Moore and Mushrush , simply because a sentencing statute gives the trial court discretion to impose conditions that are not specifically delineated in the statute does not make that statute vague. Instead, the real question is "whether the trial court has abused his discretion[, which] depends upon the facts in each case." State v. Smith , 11th Dist. Ashtabula No. 896, 1977 WL 199474, 2 (Sept. 6, 1977).
{¶ 91} Accordingly, we overrule Minarik's second assignment of error.
C. Fifteen-Year Sex Offender Registration Requirement
{¶ 92} In his third assignment of error, Minarik argues that the trial court's imposition of a 15-year period for registration as a sexual offender was excessive punishment in violation of the Eighth Amendment to the United States Constitution and Article I, Section 9, of the Ohio Constitution.
{¶ 93} Again, Minarik failed to raise the constitutionality of R.C. 2950.01 - which states that anyone convicted of an offense in violation of R.C. 2907.06 is a Tier I sex offender - below, and therefore, he waived that issue.
{¶ 94} Nonetheless, we have discretion to consider a forfeited constitutional challenge to a statute under the plain-error standard. State v. Martin , 2016-Ohio-922, 61 N.E.3d 537, ¶ 13. To succeed under that standard, an appellant must show that but for a plain or obvious error, the outcome of the proceeding would have been different and that a reversal is necessary to correct a manifest miscarriage of justice. State v. Davis , 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d 147, ¶ 29.
{¶ 95} In Martin, the appellant also failed to raise his constitutional challenge of Ohio's adult registration and notification requirements. We nevertheless exercised our discretion and addressed his issue under the plain-error standard. We stated
Considering Martin's argument, he has not shown that the outcome would have been different had he objected. Just because his objection would have given the trial court the opportunity to consider the constitutionality of R.C. Chapter 2950, does not mean that the trial court would have found the statute unconstitutional as applied to him. And even if he had objected, it is our view that the trial court would not have found R.C. Chapter 2950 unconstitutional as applied to Martin.
For adult sexual offenders under R.C. Chapter 2950 * * *, trial courts have no discretion in labeling the offender. A sex offender's classification is automatically determined by the offense. R.C. 2950.01(E) - (G). The duration of the offender's obligation to update his or her personal information for the registry, as well as the frequency of that duty, depends upon his or her tier classification. R.C. 2950.04 through R.C. 2950.07.
Id. at ¶ 14-15.
{¶ 96} We find that our above discussion from Martin is on point with the instant case. Minarik has not shown that the outcome of his sentencing hearing would have been different had he timely challenged R.C. Chapter 2950. His Tier I sexual offender classification as well as his reporting requirements are clearly delineated in the Revised Code, and the trial court had no discretion to adjust that classification or the requirements. Therefore, we find that Minarik cannot satisfy his burden under the plain-error standard.
*573 {¶ 97} Accordingly, we overrule Minarik's third assignment of error.
{¶ 98} Judgment affirmed.
EILEEN A. GALLAGHER, A.J., and TIM McCORMACK, J., CONCUR

The victim explained that, at the time of the doctor's visit, she was on probation for domestic violence and burglary, which was the result of a dispute involving her brothers.

Detective Sheridan explained that a controlled call is "a recorded call where it's monitored by a police officer, where a victim contacts the suspect to try to elicit information and possibly a confession of some sort, or evidence to be used in the case" and that the conversation is directed by the officer.

The facts and legislation at issue in Johnson are wholly distinguishable from that in the instant case and, therefore, we will not discuss Johnson . Instead, we will utilize the same principles in analyzing a vagueness argument that were discussed in Johnson as well as a number of Ohio cases.

The phrase, "worst forms of the offense," was subsequently removed from R.C. 2929.14(C) as a result of the Ohio Supreme Court's decision in State v. Foster , 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, where the court found that the statute required judicial fact-finding "before imposition of a sentence greater than the maximum term authorized by a jury verdict" and, therefore, was unconstitutional. Id. at paragraphs one and two of the syllabus.